IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| MARY HARMON, *Plaintiff* | § § § § | |
| v. | § § § | C. A. NO. 1:12-cv-00571 |
| BEAUMONT INDEPENDENT SCHOOL DISTRICT, LINDA BOUNDS, and BARBARA HARDEMAN, *Defendants* | § § § § § § § | PLAINTIFFS PRAY FOR TRIAL BY JURY |

## SECOND AMENDED ORIGINAL COMPLAINT

TO THE UNITED STATES DISTRICT COURT:

COMES NOW Plaintiff, Mary Harmon, complaining of Defendants, Beaumont Independent School District ("BISD"), Linda Bounds ("Bounds"), and Barbara Hardeman ("Hardeman"), this suit is brought under 42 U.S.C. 1983; and in support hereof, Plaintiff would show the following:

### A. Parties

1. Plaintiff Mary Harmon is a resident of Jefferson County, Texas.

2. Defendant Beaumont Independent School District ("BISD" or "District") has been served with process herein.

1

3. Defendant Linda Bounds ("Bounds"), an individual, is a Physical Education teacher at Bingham Blanchette Elementary School ("BES") in the District has been served herein.

4. Defendant Barbara Hardeman ("Hardeman"), an individual, is the Principal at BES in the District and has been served with process herein.

## C. Jurisdiction

This court has jurisdiction pursuant to Title 28 § 1343.

## D. Venue

Venue is appropriate in Jefferson County.

## E. Facts

6. E.J. is an eight year old, African-American boy, born on December 10, 2002, who suffers from bipolar-disorder, ADHD, and other diagnosed learning disabilities, and is cared for by his grandmother, Mary Harmon.

7. E.J. is a frail child and his grandmother has carefully attempted to build trust and a sense of well-being in the child, who had transferred to Bingham Blanchette ("BES") from Price Elementary School at the outset of the 2010-2011 school year.

8. E.J.'s parents, Harmon's son and E.J.'s mother, because of personal issues have entrusted E.J. to the care of Harmon, especially as relates to his school attendance and activities.

9. Over the years, Harmon has been recognized by BISD as the person who is E.J.'s daily caregiver and *de facto* guardian.

10. Both Price and BES are elementary schools located in BISD.

11. The Principal for BES was and is currently Hardeman.

12. E.J. received in class instruction form the Special Education staff, his specific teacher being Malveaux.

13. E.J also attended Physical Education classes at BES receiving his instruction from the Physical Education teacher Bounds.

14. Bounds is an exceptionally aggressive personality who has a reported history of threatening and or frightening co-workers, and students, even to the point of reportedly being segregated from some co-workers.

15. When E.J. was a student at Price, Harmon did not give BISD authorization to administer corporal punishment to E.J., and BISD honored Harmon's instructions.

16. When Harmon transferred E.J. to BES, she likewise did not did not give BISD authorization to administer corporal punishment to E.J.

17. Harmon also works for a private school operated by a Beaumont church.

18. In her employment, Harmon drives a school bus and frequently collects children from BES after the BISD school day.

19. On November 12, 2010, Harmon, went to pick up E.J. after school as was her usual practice.

20. E.J. was in noticeable pain and mental distress, crying and fidgeting in his seat as he sat in Harmon's automobile.

21. Harmon asked E.J. why he was so upset and why he couldn't sit still and was having trouble sitting in the seat.

22. E.J immediately began to sob and shake, holding his head in his hands and clearly reluctant to respond to his grandmother's questions.

23. Finally, E.J. recounted a terrifying experience, stating that Bounds had been "mean", "scared" him, hit or "paddl[ed]" him five (5) times, during his physical education class earlier in the afternoon.

24. Harmon asked the child why Bounds had so behaved, if he knew, and what Bounds had used to hit him.

25. E.J. described the object used by Bounds in her assault on him, as a heavy, wooden "bat".

26. Harmon stopped the car and listened to her grandson describe how Bounds had said that he and other boys were misbehaving and demanded that he and the three or four other boys in his second grade class, bend over as if touching their toes.

27. E.J. reported that Bound told the boys that the licks would hurt more if they were bent over than if they were standing.

28. Harmon reassured her grandson that she had not given permission for the school to use corporal punishment, and she would find out what had occurred.

29. E.J. continued to sob and tell his grandmother how Bounds was acting mean and hitting him real hard; EJ was more frayed than his grandmother had ever seen him.

30. E.J. said that Bounds became "really mad" when the other boys didn't cry at first, and she began to hit harder and harder as EJ watched waited his turn.

31. E.J. told his grandmother that he was so scared he accidentally started to pee in his pants, as he waited and watched Bounds hit the other boys; EJ said that by the time Bounds got to him as the last child, she was hitting with all her might.

32. E.J. stated that Bounds' was saying things while she hit him, scaring him and hitting him more times than she had hit the others.

33. EJ told his grandmother that when Bounds hit him the first time it hurt so bad he flinched causing Bounds to grab the child by his pant loop, jerk him up off the floor, tearing his pants.

34. Harmon took her grandchild home and ask him to lower his trousers and let her examine his little body; Harmon saw the bruises on the child and immediately called 911, to report Bounds' assault and the injuries caused to her grandson.

35. However, the operator told Harmon that they [Beaumont Police Department] could not send an officer unless she had paperwork proving that she did not give BES the right to administer corporal punishment.

36. Harmon went to the BES main office to inform Principal Hardeman of the events and obtain from E.J.'s student file a copy of the form proving BISD employees did not have the right to hit or administer corporal punishment to her grandson.

37. Principal Hardeman was not on campus but Angela Christian ("Christian"), the school's curriculum administrator offered stated the she would help Harmon.

38. Harmon explained to her what happened and Christian took Harmon to see the school nurse.

39. The nurse was unhelpful saying that she had not even taken the time to assess injuries to E.J. because it was a discipline problem.

40. While Christian and Harmon were in the school, they saw Bounds, who was loading children onto school buses.

41. Christian and Harmon calmly and non-disruptively approached Bounds, with Christian introducing Harmon to Bounds.

42. Harmon inquired why Bounds had hit E.J. and immediately, Bounds became defensive and angry, aggressively challenging Harmon for having "dared to question" how she treated or disciplined E.J..

43. Bounds then aggressively stated to Harmon, "you [Harmon] have no right to question me!"

44. Unrestrained by Christian, the larger Bounds stepped close to Harmon, put her face close to Harmon's, raised her voice and started shouting at Harmon that Harmon had "no business asking" what she [Bounds] had done to E.J.

45. Harmon, became fearful of Bounds, and Christian apparently to protect Harmon, moved between Bounds and Harmon, asking Bounds to calm down, and Harmon stated that she had authorized or

given permission for anyone to administer corporal punishment to E.J., and again asked Bounds why she had hit E.J., and hit him excessively.

46. Bounds said, "Well, E.J. and the other boys had been 'cutting up' in class, and deserved to be paddled….and… Malveaux… [E.J.'s classroom teacher,] had given her permission…."

47. Harmon again stated that no one had the right to administer any kind of corporal punishment to E.J., emphatically maintaining that she had *never* given anyone at BES, Price Elementary, or BISD, permission to paddle her grandson.

48. Bounds started to smile, interrupted Harmon, and in a sarcastic voice stated, "You have to say NOT to paddle…. and submit a 'do not paddle' permission slip to [BES] *if* you [Harmon] do not want teachers to use corporal punishment."

49. Harmon told Bounds that she had notified the district when she had registered E.J. for school of her refusal to permit her grandson to be spanked by District personnel.

50. Bounds said she had permission to "paddle" E.J. from his classroom teacher, "Malveaux", saying that Malveaux had told her that it was "ok to 'whip' E.J."

51. Harmon asked Bounds if she had even checked to see whether permission had been granted by Harmon to administer the whipping, and Bounds responded, "I am tired of talking to you…."

52. Bounds turned her back on Harmon and walked away.

53. Harmon, herself the school bus driver for a private church school, left to finish her bus route, but said to Christian that she would return after completing the route.

54. Harmon returned to BES around 4pm to obtain a copy of the form she had signed refusing permission to administer corporal or physical punishment to EJ., a form which she had signed and affirmed by her checking off the statement, "I do Not give my permission for corporal punishment"--the annual student registration form.

55. As Harmon walked into BES' office area, she saw Malveaux, Bounds, BES's secretary, school counselor Alice Johnson ("Johnson"), and Marilyn Bodah (Bodah) deep in conversation.

56. Harmon overheard one of the women say E.J.'s name.

57. Bounds turned and saw Harmon, stepped away from the others, and walked toward Harmon in an extremely hostile manner.

58. Because of Bounds' demeanor, Harmon instinctively stepped back, and turned to walk into a more public area and get away from Bounds.

59. As Harmon was walking away, she heard a voice and turned to see Bodah calling out to Bounds to "Stay away from ["Harmon"]; nevertheless, Bounds continued to walk deliberately toward Harmon, who stopped fearfully frozen in her steps.

60. Bodah, Johnson, Christian and Malveaux walked over to Harmon, Bodah told Bounds, "Go back into the office!".

61. Bounds refused, and continued to walk up to Harmon and lean into her face.

62. Bounds stood in front of Harmon with her [Bounds] arms crossed and glared silently at Harmon.

63. When Malveaux approached, Harmon calmly asked Malveaux why she [Harmon] had not been contacted in regard to the particular incident (1) as she had been contacted in the past for prior behavioral issues, and (2) why the corporal punishment had been administered when they knew at the school that she [Harmon] did not permit it, and had previously informed the teachers and even discussed her

opposition to anyone giving corporal punishment to E.J. primarily because of his bipolar disorder history, and his learning disabilities.

64. Malveaux said that E.J., "was cutting up" during PE class and she had given Bounds' permission to hit E.J."

65. Malveaux challenged Harmon's right to question how she [Malveaux] or Bounds disciplined the students, and Malveaux terminated the conversation.

66. Distressed and concerned, Harmon returned home.

67. Harmon again looked at E.J.'s bruises when she got home; E.J. had bruises all over his backside, arms and upper legs. Some of the bruises were oozing small amounts of blood.

68. Harmon treated E.J.'s injuries at home, and decided to wait to see if the bruising subsided overnight. Still aghast at Bounds' apparent sadistically brutal hitting of her grandson's body, Harmon took pictures of E.J.'s legs and backside, put the child in bed and stayed with him off and on during the night.

69. The next day, E.J. was scared to go to school and complained that he was in extreme pain, and Coach Bounds would hit him again.

70. E.J. told his grandmother he could not sit, or stand, without pain.

71. Harmon did not send E.J. to school the next day, November 13, 2010, hoping that his injuries and fears would improve and subside if given another day.

72. The next morning the injuries did not appear to be any better and E.J. continued to be genuinely distressed and afraid of Bounds.

73. On November 14, 2010, Harmon took E.J. to the hospital emergency room where he was treated by Dr. Thompson who said he was shocked at E.J.'s injuries, and also took pictures of them.

74. Again, Harmon did not send E.J. back to school.

75. On December 2, 2010, Harmon and EJ's mother met with Principal Hardeman of BES, Assistant Superintendent Bonton, and Assistant Superintendent Philip Brooks of BISD. In that meeting, chaired and recorded by Brooks, Hardeman testified that she had checked and rechecked on Harmon's claim that a "Do Not Administer Corporal Punishment" form was on file, but she could not locate it. Further, Hardeman stated that both Malveaux's statement and Bounds' statement would not be changed or removed from the District's file for the corporal punishment event of November 12, 2010. In her statement, Bounds had reportedly stated that the child EJ had made a sexual gesture to her, which

played a part in her decision to punish the child. Hardeman stated that CPS and the BISD Police Department ("BISD PD") were investigating, but that no reports had been received from either.

76. During the meeting, Hardeman said Malveaux had told her that Harmon gave her permission to "get" E.J.

77. Harmon denied that she had ever permitted or authorized physical punishment of her grandson and that all she had ever done was that she given Malveaux permission ONLY for non-physical punishment of E.J. and had not authorized corporal punishment and had even expressly denied such authority to the school.

78. During this meeting, Hardeman further provided defensive and self-serving statements from Malveaux and Bounds.

79. Hardeman said that Bounds had stated that E.J. had made sexual gestures during gym class, and that is why she had "administered the punishment.

80. Hardeman reported that Malveaux had said Bounds' hitting E.J. could not have been "badly hurt" because he came back to class and worked at his desk, and he was putting on for his grandmother.

81. Hardeman, approved the actions and statements of Malveaux and said that Bounds' had every right to hit E.J. because Harmon had given Malveaux permission to use corporal punishment.

82. Harmon expressly and vigorously disputed that statement, correcting Hardeman; Harmon emphasized that she had never given anyone permission to hit E.J.

83. Harmon repeatedly emphasized to Bonton and Hardeman that she had never given anyone at BISD permission to use corporal punishment with E.J. and further stressed that no one at BES had ever given her any form regarding permission, or denial of permission, to use corporal punishment, but that such information was still contained in the transfer paperwork for E.J. from Price, also a BISD school.

84. Again, Harmon asked to see the form for the transfer and again was denied access to the document by the District employees.

85. Harmon pointed out that she had spent considerable time working with BISD administrators to ensure that E.J.'s file from his previous school, Price, had been transferred to BES, and that even that paperwork included a signed form from Harmon in which she *explicitly denied* BISD permission to strike E.J.

14

86. Principal Hardeman acknowledged that BES had received E.J.'s file, but said she could not find the "do not paddle" form signed by Harmon.

87. Hardeman admitted that she had "overlooked" and failed to send pertinent registration forms to BES parents that contained the provision allowing parents to opt-out, or refuse to permit the administration to use corporal punishment.

88. Bonton assured Harmon that BISD had implemented new policies against paddling, and said that no other student would ever undergo abuse like E.J. had received at Bounds hands. Bounds proceeded to symbolically communicate to Mary Harmon her hostility and the risk to which EJ was subjected at BES.

89. As apparent "sop" for Harmon, Principal Hardeman stated at the meeting on December 2, 2010 that E.J. had been reassigned to the classroom of a teacher other than Malveaux, that Bounds would no longer have any contact with EJ, and that corporal punishment had been universally suspended at BES.

90. BISD PD it had reported the incident to the Jefferson County District Attorney's office ("DA").

91. Ed Shettle ("Shettle") of that office told Harmon that the case had not been reported by the BISD PD. Specifically, when no one from the DA's office returned Harmon's calls, she went to speak with someone at the DA's office. She met with Shettle, who told her that he had never heard of E.J.'s case, and was sure that no one in the District Attorney's office knew anything about Bounds' beating of E.J. Shettle promised that the DA's office would request a copy of EJ's file from BISD.

92. Then, the case found its way from the BISD PD to the DA's office, but on December 8, 2010 it was refused for prosecution.

93. Nevertheless, after December 2, 2010, Bounds still had contact with Harmon who was a school bus driver for her church's school, , the Greater Good Hope School, which transported students between Bingham Blanchette and the church school. During the 2010-2011 school year, Harmon made three daily stops at BISD schools.

94. On or about the middle of January, 2011, the Director of Greater Hope School, Ms. Carol Marx, called Harmon into her office, and told her that she, Marx had received a call from Principal Hardeman claiming that Harmon had threatened Bounds. Marx

stated that Hardeman told her that Harmon had taken a picture of Bounds from the bus which caused Bounds to be "scared for her life." According to Marx, Hardeman further stated that she and Bounds had called the BISD police to report that Harmon had threatened them.

95. Harmon told Marx that the claims were false and that she had never photographed Bounds and or Hardeman which both Hardeman and Bounds knew.

96. Marx said that Hardeman was adamant that Harmon be questioned.

97. Then, Bounds then tried to frighten Harmon more directly. Approximately two weeks after Hardeman called Ms. Marx, Harmon's employer, Bounds walked over to the Greater Good Hope Church van which Harmon was driving when it was parked at BES waiting for students. Bounds suddenly opened the van's door, stood about two feet away, and ominously stared at Harmon.

98. Bounds, who regularly stands outside BES to monitor students being loaded and unloaded, had never before behaved in such a manner. Frantic to protect herself and the Greater Good students,

17

Harmon remained in her seat, sounded the bus horn to get someone's attention, and sent one of the students to get help. Hardeman was talking to a parent, heard the bus horn, saw Bounds, walked to the bus, and instructed Bounds to get out and return to her duty station. Bounds said nothing, but glared threateningly at Harmon over her shoulder as she walked away. Harmon had to ask Hardeman to keep Bounds away from her and the Greater Good students.

99. BISD has a pattern and practice of engaging in cover-ups of claims against members of its faculty. This case is about another such cover-up.[1]

100. BISD ratified Hardeman's and Bound's complained of conduct and actions herein.

## F. Causes of action

101. Re: Mary Harmon

a. FREE SPEECH

---

[1] Eg., *WHITNEY GUILLORY, Plaintiff-Appellee,v. CARROLL THOMAS, Supt., Defendant-Appellant,* No. 09-40518 (COA 5th, Dec. 14, 2009)

1.) Mary Harmon exercised protected speech when she refused to authorize or permit defendants to administer corporal punishment or strike the body of E.J., and when she reported the corporal punishment by Bounds to Hardeman and the administration of BISD.

2.) Defendants retaliated against Mary Harmon by attempting to deliberately interfere with protected aspects of her relationship with her grandson E.J. by hiding the BISD documents executing which denied authority to

3.) Defendants retaliated against Mary Harmon by attempting to deliberately interfere with protected aspects of her relationship with her employment and vocation.

4.) Defendants were substantially or motivated by Mary Harmon's exercise of protected speech in taking their adverse actions against her.

5.) But for Harmon's exercise of protected speech, Defendants would not have taken the adverse actions against Harmon.

### G. Causation and damages

Plaintiff has suffered actual damages, economic and non-economic, which were proximately caused by Defendants conduct. Plaintiff seeks the following relief: Actual damages as deemed appropriate by a jury herein; punitive damages against the individuals as deemed appropriate by a jury, and consistent with the

law; reasonable and necessary attorney fees and costs as determined by the court; and all further relief to which she may be entitled whether in law or equity.

## H.  Prayer

For these reasons, plaintiff asks that Defendants be cited to appear and answer and that Plaintiff be awarded a judgment for damages against defendants.

>Respectfully submitted,
>
>WATTS & ASSOCIATES
>
>/s/ *Larry Watts*
>Larry Watts
>SBN 20981000; FID 7092
>P.O. Box 2214
>Missouri City, Texas 77459
>Phone (281) 431-1500
>Fax (877) 797-4055
>Email: wattstrial@gmail.com

### CERTIFICATE OF SERVICE

I, Larry Watts certify that a true and correct copy of this document has been served on opposing counsel by filing with the clerk's CM/ECF filing system on the 18th day of September.

>/S/LW
>Larry Watts